NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 9, 2020
Decided July 10, 2020

**Before**

DIANE S. SYKES, *Chief Judge*

MICHAEL S. KANNE, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 19-3535

| | |
|---|---|
| CATHAY INDUSTRIES USA, INC., *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 16 C 2070 |
| WILLIAM J. BELLAH, *Defendant-Appellee*. | Maria G. Valdez, *Magistrate Judge*. |

**O R D E R**

Invoking federal diversity jurisdiction, Cathay Industries USA, Inc., sued William J. Bellah for breach of contract based on his failure to pay on a $1.5 million promissory note. Bellah signed the note as part of a merger of companies; when those companies later split up, Bellah contends, Cathay USA released his debt under the note. The district court ruled in favor of Bellah based on extrinsic evidence that the parties intended for Bellah's debt to end when the companies split up. Because the district court properly admitted extrinsic evidence and made no clear error in finding that Cathay USA released Bellah when the merged companies split, we affirm.

## I.

The promissory note at the heart of this case arose from a 2007 merger agreement between Bellah, the defendant, and Terence Yu, owner of Cathay USA (the plaintiff). The merger was designed to be an equal exchange of ownership shares: Bellah would trade a percentage of Compass Chemical International, LLC, his chemical-import company, for a stake in Cathay USA's parent company. The parties soon realized Bellah would incur a personal tax obligation of $1.5 million because of the swap, so Compass granted Bellah a "loan" of $1.5 million, to move the deal forward. Bellah signed a promissory note to repay that amount in annual installments over ten years.

The note referred to a separate "Agreement" in several places, and provided that:

- The loan was made "under and pursuant to that certain **Agreement** by and between Borrower [Bellah], Lender [Compass], and Terence Yu, dated simultaneously … ."

- "Capitalized words and phrases not otherwise defined … shall have the meanings assigned … in the **Agreement**."

- "This Promissory Note evidences certain promises made by the Borrower under and pursuant to the **Agreement**, to which reference is hereby made for a statement of the terms and conditions under which the Maturity date … may be accelerated."

- "The holder of this Promissory Note is entitled to all of the benefits and security provided for in the **Agreement**."

- "[E]ach provision of the **Agreement** and this Promissory Note shall be interpreted ... under [Illinois] law … ."

(Emphases added). According to Yu, the "Agreement" was the contemporaneous deal to swap shares and merge the companies.

As part of the merger, Yu and Bellah also executed a "Consulting Services Agreement" under which one of Bellah's companies, Bel-Air Investments, Inc., would provide consulting services to Cathay Pigments Holdings, LLC, (the plaintiff's parent company). In exchange, Bel-Air would receive "partial payment for Consultant's sale of his interest in Compass Chemical." (During litigation, Cathay USA and Bellah stipulated that "[t]he parties to the Consulting Services Agreement, and the parties to

the Note agreed that a portion" owed to Bel-Air under the Consulting Services Agreement was to be "be credited toward the Note to reduce the amounts Bellah owed." The Consulting Agreement was to last five years, and it gave Bellah the option to renew it for another five—a ten-year period coterminous with the repayment term under the note.

About four years later, in 2011, Bellah and Yu decided to undo their merger and took steps to unwind their enmeshed business interests. The "demerging," as Yu described it, was intended to return the parties and their ownership interests to the pre-merger state. "[W]hen we swap[ped], we do … one process" and when "we demerge, … we opposite [sic.] the process," Yu explained. The split-up took about a year to finalize, and it involved two key transactions.

First, Cathay USA transferred ownership of Compass Chemical back to a company called BMMC, Bellah's holdings company, and as part of the transfer, Cathay USA agreed to provide administrative services to Compass. As compensation, Compass (now back under Bellah's ownership and control) assigned to Cathay USA (still under Yu's ownership and control) any right to payment remaining under the $1.5 million promissory note he executed during the merger.

Second, Cathay USA and BMMC executed a "Payoff Agreement"—a contract Yu described as "the end of the whole thing." The Payoff Agreement provided for cross-payments of $15 million and an exchange of ownership of shares, and it included a "general release" discharging "BMMC, and its … agents … from any and all … debts … of any and every nature whatsoever … ." Yu further stated that he understood this provision to result in "no more obligation between Cathay and BMMC." In keeping with that understanding, Bellah and Yu contemporaneously cancelled the Consulting Services Agreement and the contract obligating Cathay USA to provide administrative services to Compass Chemical.

## II.

After executing the Payoff Agreement and believing his debt released, Bellah stopped paying on the $1.5 million note, starting the events that led to this suit. Cathay USA declared all unpaid amounts immediately due, and eventually sued Bellah for breach of contract. Jurisdiction was based on diversity of citizenship. As relevant to this appeal, Bellah asserted two affirmative defenses: (1) any amounts owed were subject to setoff based on amounts due to Bellah under the Consulting Agreement; and (2) any

obligation under the note was "satisfied and released as part of a series of transactions between Plaintiff and Defendant."

Several pretrial rulings affected Bellah's two defenses, which Cathay USA moved to bar. On the first defense, the district court ruled that Bellah could not set off amounts owed under the Consulting Agreement because the note was between Bellah and Cathay USA, while the Consulting Agreement was between Bel-Air and Cathay Holdings. But on the second defense, the court found a triable factual dispute about whether the "demerger" discharged Bellah's obligation to repay the note.

Later, Cathay USA also moved to bar Bellah from asserting a new affirmative defense that he raised in the Joint Pretrial Order. Bellah intended to argue that any amount he owed under the note was discharged when the Consulting Agreement was cancelled because, he argued, payments under that agreement were a "condition precedent" to his note obligation. The district court granted this motion, ruling that allowing Bellah to introduce a new defense on the eve of trial would unfairly prejudice Cathay USA. The court later clarified that it barred Bellah only from asserting a new "affirmative defense"; proffered evidence still could be relevant to other issues.

The bench trial (over which a magistrate judge presided by consent) came next. Bellah offered extrinsic evidence suggesting that he and Yu intended the note to be repaid from the Consulting Agreement payments; Cathay USA objected to the evidence's relevance. The district court stated it would decide relevance "at the end of the case," but it invited Cathay USA to object to any submission it believed was prejudicial. As relevant to this invitation, Cathay USA then objected to only two lines of testimony: (1) that the note was to be repaid from the Consulting Agreement payments; and (2) about the amounts received under the Consulting Agreement. It did not object to, and in fact relied on, excerpts from Yu's deposition that the note and the Consulting Agreement were both part of the merger deal. Specifically, Cathay USA introduced Yu's statements that he loaned Bellah the $1.5 million "to pay [his] tax" accrued through the merger "with the repayment to come out of his bonus payment every year"; that this arrangement "waived the whole 1.5 million"; and that the "demerge[r]" process was meant to be the "opposite" of the merger process.

After trial, the district court entered judgment for Bellah, accepting his defense that the split-up released him from the note. It ruled that the note's use of "Agreement" was ambiguous, necessitating extrinsic evidence. And based on that evidence, the court found that: (1) the "Agreement" was the deal to swap shares and merge; (2) Bellah would not have agreed to the merger if he believed that he would be responsible for the

$1.5 million tax liability resulting from it; (3) the Consulting Agreement was part of the merger, and the course of dealing between Bellah and Yu showed that Bel-Air had been paying (through the Consulting Agreement) the installments due on Bellah's note; (4) when Bellah and Yu agreed to split up the merger, they agreed to cancel the Consulting Agreement; and (5) once the merger ended, the parties likewise "cancelled" Bellah's obligations under the note.

## III.

On appeal, Cathay USA contends the district court improperly based its judgment on a finding (and barred defense) that the note was to be repaid only on the "condition" that Bellah received payments under the Consulting Agreement. Bellah responds that the court rightly considered—and made permissible findings based on— the extrinsic evidence that his obligation under the note was cancelled (that is, released) when the parties ended the merger.

At the outset, we note that Cathay USA bases its appeal on an invalid premise. The company appears to assume that the evidence about the relationship between the note and the Consulting Agreement was relevant only to Bellah's barred affirmative defense that payments under that agreement were a "condition precedent" to his repayment obligation. As a result, Cathay USA faults Bellah for not pleading "with particularity" the defense of the failure of this condition precedent, as Federal Rule of Civil Procedure 9(c) requires, and argues that reversal is warranted on this basis. But Cathay USA's argument ignores the district court's ruling that evidence about the relationship between the note and the Consulting Agreement could be relevant to other issues. These included the meaning of the note and Bellah's properly pleaded defense that his note debt was "satisfied and released as part of a series of transactions between" the parties.

The better focus, therefore, is whether the district court abused its discretion in admitting this extrinsic evidence for the purpose of deciding these other issues or whether it clearly erred in making any of its findings based on this evidence.

## A.

Under Illinois contract law, which the parties agree governs, extrinsic evidence is relevant to a contract's meaning only if the contract is incomplete ("unintegrated") or ambiguous on its face. *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878–79 (7th Cir. 2005) (applying Illinois law). So the first issue is whether the district court correctly ruled that

extrinsic evidence was relevant to determine the meaning of the promissory note. *Id*. at 878 (decision to admit extrinsic evidence is legal question).

We conclude the district court properly ruled that extrinsic evidence was relevant to interpreting the note. It observed that a contract is ambiguous when a term is susceptible to more than one meaning. *See Asset Recovery Contracting, LLC v. Walsh Constr. Co. of Illinois*, 980 N.E.2d 708, 726 (Ill. App. Ct. 2012). It also correctly concluded that the note was unintegrated because it "references" and "incorporate[s] … unwritten terms in the Agreement." *Cf. Davis*, 396 F.3d at 878–79 (contract is integrated if it purports to be complete agreement between the parties). The note mentioned but did not specify, identify, or attach the terms of the "Agreement by and between Borrower, Lender and Terence Yu"—even though this Agreement was "dated simultaneously" to the note, outlined unidentified "terms and conditions," offered unlisted "benefits and security" to the note holder, and "defined" the note's "Capitalized words and phrases." These omissions rendered the note incomplete and unintegrated. *See Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 957–58 (Ill. App. Ct. 2001) (citing *J & B Steel Contractors v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1220–21 (Ill. 1994)). The district court therefore properly considered relevant any evidence about the meaning of the "Agreement." *See Eichengreen*, 757 N.E.2d at 958; *see also CFC Inv. v. McLean*, 900 N.E.2d 716, 723 (Ill. App. Ct. 2008) (absent signs of intent of "complete integration" court properly admitted evidence of prior "course of negotiations").

A district court may be required to exclude even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice to the party opposing admission. FED. R. EVID. 403. But for two reasons Cathay USA cannot reasonably argue that it was prejudiced by the admission of extrinsic evidence that the "Agreement" upon which the note depended included the Consulting Agreement and the arrangement to swap shares. First, Cathay USA knew that the terms of the "Agreement" are referenced, but undefined, in the very note it sought to enforce. So it was on notice from the outset of the case that evidence about the meaning of the Agreement was fair game. *See generally DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 626–28 (7th Cir. 2013) (plaintiff must prove terms of defendant's obligation under contract to show breach). Second, Cathay USA introduced and relied on Yu's testimony that the "Agreement" included both the Consulting Agreement and the share swap to merge two companies. Because Cathay USA invited and relied on testimony that the Agreement to which the note was subject included the merger and Consulting Agreement, the district court reasonably admitted this extrinsic evidence to determine the note's meaning. *Estate of Escobedo v. Martin*, 702 F.3d 388, 400–01 (7th Cir. 2012).

We recognize that, before trial, the district court ruled that requiring Cathay USA to rebut Bellah's proposed affirmative defense (that the note was to be repaid only from the Consulting Services Agreement) would unfairly prejudice Cathay USA. But at trial the court did not suddenly (and implicitly) reverse itself and require Cathay USA to rebut that affirmative defense. Rather, as it warned Cathay USA before trial, it treated as potentially relevant any evidence about the parties' intent under the note. Because the note was ambiguous, and because Cathay USA introduced evidence from Yu about the interdependency of the note, the merger, and the Consulting Agreement, Cathay USA was not unfairly prejudiced by the district court's reliance on this evidence.

**B.**

Next, Cathay USA challenges the district court's finding that Bellah's debt under the note ended when the Consulting Agreement was cancelled and the companies "demerged." The parties characterize the court's finding as a mixed question of law and fact and cite *Cook v. City of Chicago*, 192 F.3d 693, 696 (7th Cir. 1999), and suggest that this court should review it for abuse of discretion. The Supreme Court, however, has instructed that the proper course is to review for clear error when the mixed question required the district court to "marshal and weigh evidence" or "make credibility judgments"—both of which are at play here. *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC,* 138 S. Ct. 960, 963, 967–69 (2018).

Reprising variations of its earlier arguments, Cathay USA offers two reasons for why it believes that the district court wrongly concluded that Bellah is not liable on the note. First, the company maintains that the district court's finding was precluded by its ruling that barred Bellah from raising the affirmative defense that payments on the note would come from only the Consulting Services Agreement. *See Wood v. Milyard*, 566 U.S. 463, 470 (2012) (forfeited affirmative defense is excluded from the case). Second, it contends that the ruling conflicts with the parties' pretrial stipulation that those payments would only "reduce" amounts owed under the note. This language, Cathay USA contends, bars a defense that the parties intended to repay the note entirely from the Consulting Agreement.

Neither argument persuades us. They both assume that the district court ruled for Bellah based on unavailable defenses. But Cathay USA lost because Bellah prevailed on his available defense of release. The district court found—based on extrinsic evidence about the meaning of the "Agreement" incorporated by the note—that the parties intended for Bellah to pay on the note for so long as the "Agreement" (the share swap and Consulting Agreement) was in effect. The evidence that Cathay USA

introduced supported these conclusions: Yu testified that the $1.5 million "loan" was "to pay [Bellah's] tax" accrued through the merger; "the repayment [would] come out of his bonus payment every year"; this arrangement "waived the whole 1.5 million"; and, finally, the "demerg[er]" process was the "opposite" of the merger process. The court therefore reasonably ruled that when Yu and Bellah agreed to the "opposite" of the "Agreement" (through the split-up, Payoff Agreement, and cancellation of the Consulting Services Agreement), Cathay USA also "cancelled" (or, released) Bellah's debt under the note. Because this finding was reasonably based on admissible evidence that the merger, note, and Consulting Agreement were interdependent, it should not be disturbed. *See Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013).

\* \* \* \*

In sum, Cathay USA cannot prevail on appeal by challenging evidence that it relied upon in the district court. The court properly admitted this evidence in light of its permissible pretrial rulings. It also reasonably found based on this evidence that the parties never intended for Bellah to continue to repay a $1.5 million "loan" to finance a merger that the parties agreed to undo. We therefore AFFIRM the judgment.